AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

United States of America

v.

Lorita Sha'na Hayes,

Defendant(s)

Case No.   2:23-mj-02129

FILED
CLERK, U.S. DISTRICT COURT
4/29/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____DL_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 28, 2023 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ by telephone
Complainant's signature

Marlon Coronado, TFO, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 29, 2023

/s/ Rozella A. Oliver
Judge's signature

City and state:   Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
Printed name and title

AUSA: Angela Makabali, ext. 2331

**AFFIDAVIT**

I, Marlon Coronado being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Lorita Sha'na Hayes ("HAYES") for a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California, as described more fully in Attachment A:

   a. A gold colored iPhone 11 Pro Max, serial number G6TZT111N70F, model number MWG42LL/A, in a brown case seized from HAYES' person when she was arrested on April 28, 2023.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance) and 846 (conspiracy and attempt to distribute a controlled substance) (together, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF TASK FORCE OFFICER MARLON CORONADO

5. I have been a Los Angeles Airport Police Department ("LAXPD") Officer since June 2004. I have been assigned to the DEA as a sworn Task Force Officer ("TFO") since July 2015. I am currently assigned to the DEA Los Angeles Field Division, Los Angeles International Airport Narcotics Task Force ("LAXNTF").

6. The LAXNTF is an inter-agency task force based at the Los Angeles International Airport ("LAX"). In addition to the DEA, the LAXNTF consists of the following agencies: the Los Angeles World Airports Police Department, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department. The LAXNTF also works closely with the United States Customs and Border Protection ("CBP"), the Transportation Security Administration ("TSA"), the Department of Homeland Security, and the Federal Bureau of Investigation. All of the aforementioned agencies recognize the need for a coordinated law enforcement effort to target airport/airline internal criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States, and throughout the world.

7. Specifically, the LAXNTF is focused on investigating airport/airline internal conspiracies in which criminal enterprises recruit airport/airline employees to exploit their privileged airport access and knowledge of existing airport security procedures, as well as airline passengers smuggling drugs and drug proceeds through the airport. Previous and current investigations have identified Transnational Criminal Organizations ("TCOs") that rely generally on drug trafficking as their primary source of revenue. As such, TCOs require the use of various forms of transport in order to obtain and distribute large amounts of illicit drugs into and through the United States, and air travel provides a significant opportunity for them to do so. Additionally, air travel provides an opportunity to smuggle and distribute other contraband, including drug proceeds.

8. During my career, I have participated in a variety of drug investigations ranging from simple possession to complex international conspiracies. I have also participated in the execution of search warrants, conducted physical surveillances, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.

9. From June 2014 through June 2015, I was assigned to Homeland Security Investigations ("HSI") as a TFO. While assigned to HSI, I participated in several drug investigations, involving the unlawful importation, exportation, possession with

3

intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, and the conducting of monetary transactions involving the proceeds of specified unlawful activities.

10. Based on my training and experience, I am familiar with the methods of operation of drug traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.  I am also familiar with the methods of operation used by people who distribute controlled substances, including the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

### III. SUMMARY OF PROBABLE CAUSE

11. On April 28, 2023, TSA and LAXPD officers at LAX discovered approximately 1.42 kilograms of a white powdered substance, which later presumptively tested positive for fentanyl, in a suitcase bearing a tag with the name "Lorita HAYES."  Law enforcement learned that HAYES was scheduled to travel on Southwest Airlines flight #1727, from Los Angeles, California, to Kansas City, Missouri, that day.  LAXPD officers arrested HAYES, who possessed the SUBJECT DEVICE at the time. During a Mirandized, recorded interview, HAYES admitted that she knew there were drugs in her suitcase and stated she had previously transported drugs in her luggage.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. TSA Discovers Drugs in HAYES's White Suitcase

13. According to a report by LAXPD Officer Imelda Gutierrez, related to incident number 23-069945, reported on April 28, 2023, and based on conversations with Officer Gutierrez:

    a. On April 28, 2023, at approximately 8:41 a.m., TSA Officer Wai Louie was assigned as the x-ray operator at LAX Terminal 1. TSA Officer Louie observed anomalous "organic matter" on the x-ray monitor after a white colored "SHEN"-brand suitcase had passed through the x-ray machine and requested a secondary bag search of the suitcase pursuant to TSA policy.

    b. In the secondary bag check area, TSA Officer Maurice Moore opened the suitcase and discovered a package wrapped in green and clear plastic, with several towels wrapped around it inside the suitcase. Officer Moore swabbed the package to determine if it contained any explosives. When the results tested negative for explosives, Officer Moore notified LAXPD for further investigation.

    c. Officer Ramos learned that the suitcase tag bore information indicating that the suitcase was scheduled to travel on Southwest Airlines flight WN1727 with passenger "Hayes,

Lorita," from Los Angeles, California, to Kansas City, Missouri, departing from Gate 14 at 9:20 a.m.

   d. Officers Ramos and Gutierrez advised LAXPD Officers Rafaela Maldonado and Christin Fuentes, who were assigned to Terminal 1, that HAYES was due to depart from Gate 14 at 9:20 a.m. The LAXPD Surveillance Footage Unit described HAYES as a black female wearing all black clothing under a blue denim jacket, as well as large hoop earrings. Officer Fuentes found HAYES near the shops and restaurants around Gate 14 at approximately 9:05 a.m.

   e. Officer Fuentes explained to HAYES that she was being detained based on an anomaly that TSA agents discovered inside her checked luggage. Officer Fuentes asked if HAYES she checked in a suitcase with the airline, and HAYES replied "Yes, and a backpack."

   f. Officer Fuentes asked HAYES if she packed her own bags, and HAYES replied that someone else packed it, but that she only packed the backpack. HAYES also told the officers that she was traveling alone and that, to her knowledge, the checked bag contained children's clothing. HAYES further stated that she never thought of checking the inside of the suitcase because it was locked.

   g. A few minutes later, Officer Maldonado arrived on scene and asked HAYES if she packed her luggage herself and if the contents in the bags belonged to her. HAYES then replied "Yes," but then explained that she packed her black-colored backpack and someone else packed the suitcase, which was locked

before she left for the airport.  HAYES told the officers that she was in Los Angeles to house-sit for another person, who gave her the suitcase with the unknown contents.

   h. A few minutes later, HAYES spontaneously stated that the suitcase came from a different person.  HAYES was unable to provide officers with the names of either of her associates, including one with whom she stayed during her trip to Los Angeles.

   i. DEA Special Agent Norm Tobias arrived to the bag room at approximately 9:30 a.m. and conducted a presumptive test of the white powdery substance inside of the kilogram-sized plastic-wrapped package using a TruNarc sperometer device which resulted positive for fentanyl.

  **B.** **HAYES Admits to Transporting Drugs**

 14. Based on my review of Officer Gutierrez's report of the same incident and conversations with Officer Gutierrez, I know the following:

   a. At approximately 9:45 a.m., Officer Gutierrez read HAYES her <u>Miranda</u> rights from LAPD Form 15.03.00.  HAYES agreed to provide the following statements: she had two kids, was past due in rent, and agreed to perform a favor for extra cash.  HAYES refused to specify the type of favor, but added that she received $2,000 for her trip to Los Angeles.

   b. Officers Maldonado and Fuentes arrested HAYES and seized a gold iPhone 11 Pro Max, serial number G6TZT111N70F, model number MWG42LL/A, with a brown colored case (i.e., the

7

SUBJECT DEVICE), that HAYES was holding, and brown purse she was carrying, and brought HAYES to the LAX Narcotics Task Force office.  Meanwhile, Officers Ramos and Gutierrez transported the suitcase and the drugs from the Terminal 1 TSA baggage room to the LAX Narcotics Task Force office.

    15.  Upon arrival, LAX Narcotics Task Force members Detectice Gonzalez and I took custody of HAYES and the seized items for processing.  I, as witnessed by Detective Gonzalez, processed into evidence the package containing presumptive fentanyl, which was wrapped in green and clear plastic and weighed approximately 1.42 kilograms (including the packaging).

    16.  At approximately 11:49 a.m., I, as witnessed by Detective Gonzalez, read HAYES her Miranda rights, and HAYES acknowledged that she understood her rights.  HAYES initialed the DEA-13 Advice of Rights form and indicated she was was willing to answer questions without his attorney present.  In a recorded interview, HAYES said the following:

        a.  On April 26, 2023, HAYES flew out from Kansas City, Missouri, to Los Angeles, California, on a one-way ticket. HAYES purchased her the Kansas City to Los Angeles ticket for $299.00 with a return flight for $349.00.  HAYES said she got into a "situation" with her rent and that someone she knew asked HAYES to travel to Los Angeles for two days in exchange for $2,000.  On April 27, 2023, an associate of the person who asked HAYES to travel to Los Angeles came to the place HAYES was staying in Los Angeles and asked HAYES to transport a white suitcase to Kansas City, Missouri.  HAYES stated the the

suitcase was locked when she received it and that she did not know if the suitcase was already in the house.

   b. When asked whether it made sense to transport a suitcase for $2,000, HAYES stated that she thought the suitcase contained baby clothes. Approximately one minute later, HAYES admitted that she knew the bag contained drugs when she received the suitcase. HAYES also stated that she was not trying to transport drugs but she needed the money because she had been working two jobs and still has not been able to make it. HAYES said that she knew the suitcase had drugs, but did not know the type of drugs.

   c. HAYES said that someone was going to pick her up from the airport once she landed in Kansas City, and that she would be paid for her sevices once she got back to Kansas City.

  17. At approximately 12:08 p.m., TFO Coronado as witnessed by Detective Gonzalez, asked HAYES for consent to search her iPhone. HAYES verbally consented and also signed a DEA consent form.

  18. HAYES then stated that in March 2023, she was also paid $2,000 to travel to Los Angeles, but that she did not transport a suitcase during that trip.

  19. After I explained that investigators could possibly review surveillance footage of HAYES at the airport in March 2023, HAYES stated she also transported a suitcase that an associate gave her, which could have contained "weed," which I understood to mean marijuana.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

20. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

10

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

   f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

   g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

        h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c. It is also likely that a significant portion of the digital data to be reviewed will be in a language other than English, for which reviewers may need a translator.

24. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

14

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.  The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HAYES' thumb and/or fingers on the devices; and (2) hold the devices in front of HAYES' face with her eyes open to activate the facial-, iris- , and/or retina-recognition feature.

  25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

26.  For all the reasons described above, there is probable cause to believe that Lorita HAYES violated 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).  There is also probable cause that the items to be seized in Attachment B will be found in the SUBJECT DEVICE, described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  29th day of
April, 2023.


/s/ Rozella A. Oliver
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE